Filed 9/5/25  Marriage of Chapman and Villagomez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of CHRISTIAN C. CHAPMAN and YOLANDA RIVERA VILLAGOMEZ. | |
| CHRISTIAN C. CHAPMAN, Appellant, v. YOLANDA RIVERA VILLAGOMEZ, Respondent. | G064188 (Super. Ct. No. 18D007403) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michele Bell, Judge. Affirmed in part, reversed in part and remanded with directions.

Michel & Rhyne and Geoffrey D. Michel for Petitioner and Appellant.

Law Offices of Lisa R. McCall, Lisa R. McCall, and Erica M. Barbero for Respondent.

*      *      *

Appellant Christian C. Chapman is a practicing California attorney. He and respondent Yolanda Rivera Villagomez met in Mexico and were married in 2009. The couple settled in Southern California, purchased a home in Mission Viejo, and had three children. Yolanda was not employed until after the couple separated in 2018.

The family court bifurcated the parties' marital dissolution matter into two phases. The first phase, addressing custody and visitation, was decided in December 2022. The second phase—addressing child support, spousal support, and disposition of the community estate—concluded with a judgment on reserved issues in April 2024. This appeal concerns only the second phase.

Among other things, the family court's judgment ordered Christian to pay Yolanda $3,461 in monthly child support for their three children and an additional $2,000 in monthly spousal support.[1] As part of its *Gavron* warning, the court informed Yolanda she should "satisfy the [c]ourt's expectations about becoming self-supporting" within a reasonable period of

---

[1] As is customary in family law proceedings, we refer to the parties by their first names for ease of reference and clarity.

time or her spousal support might be reduced or eliminated.[2] However, the court ordered that Christian could not seek a modification of spousal support until either five years had passed or Yolanda had obtained "a significant vocational certificate or degree," which the court specified could not be "an associate's degree" but rather must be a "Bachelor of Science or Arts or something significant." Christian challenges that order and several other aspects of the judgment, including the amounts of child and spousal support and an order that he reimburse the community for payments it made on his law school loans.

We conclude the family court erred by limiting Christian's ability to seek a modification of spousal support and by specifying the type of training Yolanda would have to receive to be considered self-supporting. The court also erred by ordering Christian to reimburse the community for payments made on his student loans. We therefore vacate those portions of the judgment and remand to the family court with directions that it recalculate the amount of the equalization payment Christian owes to Yolanda in a manner consistent with this opinion. We also reverse the court's parenting timeshare calculation and remand to the trial court to recalculate the timeshare. To the extent the judgment on child support and spousal

---

[2] This warning derives from *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705, in which the court held a trial court may not modify or terminate spousal support for failure to seek employment without giving the supported spouse "reasonable advance warning that after an appropriate period of time the supported spouse was expected to become self-sufficient or face onerous legal and financial consequences." (*Id.* at p. 712.) The warning has since been codified at Family Code section 4330. (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 55–56.) All undesignated statutory references in this opinion are to the Family Code.

support orders relied on the court's erroneous timeshare calculation, we vacate them and remand to the court to consider whether the child and spousal support amounts should be revised based on its revised calculation of the parenting timeshare. We affirm the judgment in all other respects.

STATEMENT OF FACTS

Christian and Yolanda were married on February 14, 2009, and separated on September 3, 2018. They had three children, born in 2010, 2012, and 2015.

When the couple was first married, they lived in an apartment in Huntington Beach. Yolanda gave birth to the couple's first child after one year of marriage. She was never employed during the marriage; however, she sold a home and a car she owned in Mexico and gave the proceeds to Christian to put into a bank account. Yolanda had not graduated high school before relocating to the United States from Mexico to be with Christian, but she obtained her high school diploma in 2022, several years after her marriage to Christian ended.

Christian is a licensed attorney. During the marriage, he earned income to support the family, while Yolanda was responsible for domestic duties and caring for the children.[3] The parties enjoyed what the family court found to be a lower-middle-class standard of living. They owned a home in Mission Viejo, vacationed once in Hawaii and approximately eight times in Las Vegas, and by the end of the marriage, Yolanda drove a Cadillac Escalade and Christian a Mercedes-Benz.

---

[3] Yolanda testified she never put the children in daycare during the marriage.

4

Christian was admitted to the bar in November 2004, several years before he and Yolanda were married in 2009. He financed his law school education with federal loans. He paid interest on the loans while he was in law school, and when he graduated, he had a remaining debt of about $60,000, which he consolidated at an interest rate of 1.6 percent. He began repaying the loans in 2004. When he and Yolanda married in 2009, Christian had been working as an attorney for about four years, earning approximately $90,000 per year.

During the marriage, Christian changed jobs several times, earning a steadily increasing salary as he became more experienced. By the time the couple separated, Christian was earning approximately $150,000 in yearly salary, plus additional deferred compensation. Throughout the marriage, Christian used $24,791 in community funds to continue making payments on his student loans. At the time of the dissolution, the balance due on Christian's loans was about $20,000.

The couple purchased a home in Mission Viejo in 2010, using $46,500 in savings from Christian's earnings for the down payment. Christian's earnings as an attorney also paid for the family's vehicles.

PROCEDURAL HISTORY

Christian filed a petition for dissolution on September 4, 2018. In November 2018, each of the parties filed an ex parte application for a domestic violence restraining order. The court declined to grant either party's requested ex parte restraining order but ordered an emergency investigation and set both requests for hearing. Several days later, Christian filed a second request for a domestic violence restraining order based on alleged new developments. In response to that request, the court granted a temporary restraining order in favor of Christian, which included an order that Yolanda

5

move out of the family home and have no visitation with the children pending a hearing.

All three restraining order requests were heard on November 14, 2018, at which time the parties stipulated to dismiss all of them and to allow the existing temporary restraining order against Yolanda to expire. The parties also stipulated to temporary custody and visitation, as we describe further below.

The court entered a status-only judgment on December 10, 2019, terminating the marriage as of that date. The remaining issues were reserved and later resolved by way of a bifurcated trial.

The first phase of trial, before Judge David J. Hesseltine, was in 2022 and addressed child custody and visitation. On December 12, 2022, Judge Hesseltine entered a long and detailed Ruling After Bifurcated Custody/Visitation Trial (the custody order). In it, he found "the evidence presented at trial was not sufficient to support a finding of domestic violence against either party," even though both sides "testified as to instances of what they contend was domestic violence."

As noted above, the parties initially stipulated in 2018 to share joint legal custody of the children, with Christian having visitation every other weekend from Friday to Monday and every Wednesday overnight, and Yolanda having the children at all other times. As the proceedings dragged on through the COVID-19 pandemic, however, the animosity between Christian and Yolanda grew, and custody exchanges grew more tense. Christian asserted Yolanda withheld one or more of the children at various times, and he wanted something closer to a 50/50 timeshare. There also was testimony the children had resisted going with Christian and his relationship with his eldest child was very strained. Each parent blamed the other for the

hostility, but Judge Hesseltine found in the custody order both Christian and Yolanda were to blame.

The custody order provided the parties would share joint legal and physical custody as follows: Christian would continue to have visitation with the two younger children on alternate weekends (from Friday morning to Monday morning) and overnight every Wednesday (from Wednesday morning to Thursday morning), for a total of five days every two weeks. However, if he (1) completed a specific parenting skills class the court ordered him to complete (and submitted proof to the court he had done so within 60 days of the date of the custody order) and (2) met with a reunification therapist at least twice, his midweek visits with the two younger children "shall be extended" by one additional day (to Friday morning) for the alternate weeks in which he did not have them on the weekend. In addition, the custody order set out a detailed schedule under which Christian and Yolanda would have time with the two children on specified holidays, and it ordered each parent would have a specified amount of summer vacation time with the children. As for the oldest child, the court ordered her to participate in reunification therapy with Christian for at least six months, with the therapist to recommend when to begin and expand visitation between them outside of the therapy sessions. The court ordered all three children and the parties to participate in various types of therapy.

The second phase of trial was conducted in 2023 (the phase two trial). By that time, the case had been reassigned to Judge Michele Bell. The issues to be resolved were child support, spousal support, characterization and division of the parties' assets and debts, and payment of fees and costs.

Christian sought guideline child support based on a 48/52 percent timeshare with the two younger children. He also asked the family court to

7

impute "reasonable full-time employment and earnings" to Yolanda pursuant to Family Code section 4058, subdivision (b).[4] (Yolanda was agreeable to guideline support but objected to any imputation of income.) Christian also contended he should not be required to reimburse the community for payments made on his law school student loan debt because the community had substantially benefited from his education.

The parties agreed an equalization payment would be due from Christian to Yolanda. To determine the amount of the equalization payment, the parties and the court relied on a report prepared by the court-appointed forensic accounting expert, Barbara Hopper (the Hopper Report).

Although Hopper did not testify at the phase two trial, her written report was admitted into evidence. The Hopper Report included two different calculations for the equalization payment, which Hopper labeled Version One and Version Two. The most significant difference between the two sets of calculations was Version One assumed Christian would be required to reimburse the community for the amount of his student loan payments made during the marriage, while Version Two assumed reimbursement would not be required. Additionally, Version One reflected a $292 credit to Christian for a car registration payment he had made on Yolanda's Escalade, whereas Version Two reflected a $1,734 credit to

_____

[4] Under this section, the court must consider the earning capacity of a parent if their annual gross income is unknown.

Christian for amounts he paid for both registration and car insurance for the Escalade for the period between February 2019 and July 2020.[5]

The family court issued its judgment on the phase two trial on April 19, 2024. It consisted of a two-page Judicial Council Judgment form and a 17-page "Attachment to Judgment on Reserved Issues."

Among other things, the judgment stated the couple earned an average income of $145,000 per year throughout the marriage. It stated: "Pursuant to the stipulated balance of student loan payments made during marriage of $24,791, the Court orders [Christian] to reimburse [Yolanda] $12,395 in an equalization payment" plus interest accrued thereon. In the following paragraph, the judgment continued: "Pursuant to the opinion of Ms. Hopper, dated February 5, 2020, herein after [sic] referred to as Version [One], [Yolanda] is owed an equalization payment of $40,523, which includes the community being reimbursed for [Christian]'s student loan payments made during marriage. Accordingly, the Court orders [Christian] to pay an equalization payment to [Yolanda] of $40,523."[6] The judgment also ordered Yolanda to reimburse Christian $5,362 for amounts he paid for her car

---

[5] The Hopper report noted Christian had been ordered by the family court on March 4, 2019, to continue paying Yolanda's car insurance. The March 4, 2019 court order is not in our record, but it does not appear this is disputed.

[6] Although it is not entirely clear, it appears the court's judgment ordered Christian to pay the $40,523 equalization amount from Version One (which reflected reimbursement based on the $24,791 agreed-upon amount of student loan payments made during the marriage) *in addition to* another $12,395 equalizing payment for the student loan payments (which was not reflected in either Version One or Version Two). As we explain below, this appears to effectively "double count" the student loan payments for purposes of calculating Christian's equalization payment.

insurance and registration for the period from August 2020 through March 2023.[7]

In other words, in arriving at the total equalization payment owed by Christian to Yolanda, the court accepted the $40,523 equalization amount from Version One (which included reimbursement of the community for the student loan payments), appeared to add another $12,395 (which is half the amount of the student loan payments), and added $5,362 in car insurance/registration payments.

In determining the amount of child support, the judgment addressed Christian's request that the family court impute income to Yolanda in at least the amount of a full-time minimum wage. The court acknowledged section 4058, subdivision (a) gives it discretion to impute income to a supported spouse and section 4058, subdivision (b)(1) lists factors to be considered in exercising its discretion, to the extent they are known to the court. It found Christian was earning $15,833 per month as an attorney and Yolanda, "with no real employment history and limited education," was

_____

[7] The $5,362 figure was not reflected on either Version One or Version Two of the Hopper Report. Rather, the Hopper Report noted: "Based on the Findings & Order of March 4, 2019, the insurance for the Escalade was to be paid by [Christian]. [Christian] is requesting reimbursement for all amounts. For Version One we have not included the amounts for insurance but we have included the amount for the registration. For Version Two, we have included all amounts." We presume the difference between the $1,734 "all amounts" figure included in Version Two of the Hopper Report and the $5,362 ordered by the court is explained by the fact that the insurance and registration payments reflected in the Hopper Report covered a shorter time period than the period for which the court ultimately ordered reimbursement.

only earning $17 per hour as a part-time nanny.[8] The court further found that "[t]hroughout the marriage, [Yolanda] took care of all domestic duties while [Christian] furthered his career"; the youngest child was just over two years old when the parties separated, which "render[ed] Yolanda unable to work until that child became school age"[9]; and Christian had "failed to produce any evidence of [Yolanda's] vocational abilities and opportunity to work full time even at a minimum wage job."

Furthermore, based on its own "independent calculation," the court found Christian had an overall timeshare average of only 18.67 percent with all three of the children, which included a zero percent timeshare with the oldest child and a 28 percent timeshare for each of the two younger children.[10] Based on its analysis—including "the [c]ourt's need to look at the best interest of the children in this analysis and go through the factors"—the court concluded "[n]othing in evidence demonstrates that income should be imputed to [Yolanda] or that it serves the minor children due to the imbalance of timeshare between the parties and disparity in education." The court declined to impute income to Yolanda and ordered Christian to pay child support of $3,461 per month for all three children.

For purposes of spousal support, the court considered the marriage a long-term one, even though it lasted a few months shy of 10 years.

---

[8] We discuss further below the multiple factors the court considered, pursuant to section 4058, subdivision (b)(1), in declining to impute income to Yolanda.

[9] The court noted, "The fact that this occurred during a pandemic is not lost on the [c]ourt."

[10] The family court's order did not explain how the court arrived at the 28 percent timeshare for each of the two younger children.

After setting forth a three-page analysis of the section 4320 factors it found applicable to the parties' circumstances, the court ordered Christian to pay spousal support of $2,000 per month. The court gave Yolanda a *Gavron* warning but also ordered Christian not to seek a modification of the support order for five years or until Yolanda had "obtain[ed] a significant vocational certificate or degree. . . ." The court cautioned: "the [c]ourt does not mean an associate's degree. The [c]ourt means a Bachelor of Science or Arts or something significant."

## DISCUSSION

### I.

#### STANDARD OF REVIEW

Christian's arguments on appeal fall into three categories: (1) spousal support, (2) child support, and (3) division of the community's assets and liabilities.

Spousal support and child support awards generally are reviewed for abuse of discretion. (See *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282–283, 303–304 (*Cheriton*).) However, the court's discretion is not unbounded. In making spousal or child support awards, family courts must consider the factors outlined in the applicable statutes. For spousal support awards, the court "*must* consider and weigh all of the circumstances enumerated in [section 4320], to the extent they are relevant to the case before it." (*Id.* at p. 302.) The family court is "required to calculate child support in accordance with the mathematical formula" found in section 4055. "[A]dherence to the guidelines is mandatory, and the trial court may not depart from them except in the special circumstances enumerated in the statutes." (*Id.* at p. 284.)

12

With respect to the division of community assets and liabilities, Christian raises two sub-issues. First, he argues the trial court erred in requiring him to reimburse the community for amounts spent to repay his law school loans. Second, he contends the court improperly used the wrong version of the Hopper Report to determine his equalization payment.

The first of these sub-issues presents a mixed factual and legal question. (See *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385.) We defer to the trial court's factual findings, made after a contested trial, and review them for substantial evidence. However, we review its application of the law to those factual findings de novo. (*Ibid.*)

The second issue is an aspect of the family court's "broad statutory powers to accomplish a just and equal division of marital property," for which it is given considerable discretion. (*In re Marriage of Greaux & Mermin* (2014) 223 Cal.App.4th 1242, 1250.) Even so, the family court's determination as to the equal allocation of community assets must be based on substantial evidence. (*Ibid.*)

## II.

### SPOUSAL SUPPORT ISSUES

*A. Modification of Permanent Support Order*

Christian contends the family court erred as a matter of law by ordering that permanent spousal support was "non-modifiable" for a period of five years or until Yolanda had obtained what the court deemed a significant vocational certificate or degree. We agree the court erred.

The separately captioned "Gavron Warning" portion of the judgment states in full: "The supported party is hereby informed that it is the policy of the State of California that each party become self-sufficient or as self-sufficient as possible within a reasonable period of time. This may

13

include obtaining a career training and education and searching for employment. It is presumed that one-half the length of the marriage is considered sufficient to become self-supporting unless the marriage is one of long duration and this [c]ourt believes this is a marriage of long duration. This is why the order is that [Christian] not ask for a modification of spousal support no earlier than five (5) years from today's date or [Yolanda] obtain a significant vocational certificate or degree, and the [c]ourt does not mean an associate's degree.[11] The [c]ourt means a Bachelor of Science or Arts or something significant. [¶] If a party does not satisfy the [c]ourt's expectations about becoming self-supporting, spousal support may be reduced or eliminated."

Pursuant to section 4336, the family court retains jurisdiction indefinitely in the dissolution of a marriage of long duration, which is presumptively a marriage lasting 10 years or more (§ 4336, subds. (a) & (b)), and it always has discretion to terminate or modify spousal support in response to changed circumstances, unless the parties have agreed the support order shall not be modified. (*Id.*, subd. (c); see also § 3651, subds. (a) & (d).) It is undisputed there was no such agreement between Christian and Yolanda. Thus, the support order is always modifiable if circumstances

_____

[11] Despite the grammatical or typographical errors, we understand the court's order to mean Christian was prohibited from asking for a modification of spousal support any earlier than either five years from the date of the order, or until Yolanda obtains a "significant vocational certificate or degree," as the court defined that phrase. This interpretation is consistent with the court's earlier statement, in the "Spousal Support" portion of the judgment, that "[Christian] is precluded from modifying the permanent spousal support until five (5) years from now or until [Yolanda] completes any sort of significant vocational training, receiving a certificate for some sort of vocational field or degree."

14

change. We know of no provision of law (and neither party cites one) that would authorize the court to prohibit Christian from seeking to modify the order for any period where the parties had not so agreed.

Yolanda contends the family court did not make the order non-modifiable but rather was merely telegraphing it would not look kindly on any request by Christian to modify the order until Yolanda had received significant training. But Yolanda's interpretation is belied by the plain language of the order. After ordering that "[Christian] is *precluded from modifying the permanent spousal support* until five (5) years from now or until [Yolanda] completes any sort of significant vocational training,": the court reiterated: "This is why *the order is that Petitioner not ask for a modification. . . .*" (Italics added.) The italicized portions of the language leave no doubt the court ordered Christian not to seek a modification until one of two things had occurred: either (1) five years had elapsed from the entry of the judgment, or (2) Yolanda had obtained "a significant vocational certificate" or a degree, which would have to consist of a "Bachelor of Science or Arts" degree or some other degree the court deemed "significant." The family court had no authority to so limit Christian's ability to seek a modification of spousal support.

We therefore reverse and vacate the portions of the judgment—including those found in both the "Gavron Warning" and "Spousal Support" sections of the judgment—that limited Christian's ability to seek a modification of spousal support.

B. *Gavron Warning to Yolanda*

To the extent the family court purported to dictate precisely what kind of training, education, or degree Yolanda would have to complete before the court would consider her self-supporting, that too was an abuse of

15

discretion. The court cited no statutory or other legal authority authorizing such an order, and we are aware of none.[12] Becoming self-supporting simply requires that a party seek gainful employment, or the retraining required to obtain such employment, such that she can support herself. (See, e.g., *In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1249.) The court has no authority to specify or particularize the type of training necessary to do this.

We therefore reverse and vacate the portions of the judgment—including those found in both the "Gavron Warning" and "Spousal Support" sections of the judgment—that purport to specify the type of training or education Yolanda would have to complete to be considered self-supporting.

*C. Domestic Violence*

Christian argues the family court erred by failing to consider domestic violence in its spousal support determination, in violation of section 4320, subdivision (i). Christian correctly notes this statute requires the court to consider "[a]ll documented evidence of any history of domestic violence, as defined in [s]ection 6211, between the parties or perpetrated by either party against either party's child." But Christian has not shown the court failed to comply with the statute or otherwise erred.

First, Christian did not include in the record on appeal any evidence of domestic violence. Second, the parties had stipulated to dismiss their cross-applications for restraining orders, and to permit the Domestic Violence Restraining Order (DVRO) issued in favor of Christian against Yolanda to expire. Ultimately, Judge Hesseltine found in his December 2022

---

[12] We note Yolanda does not address this issue in her respondent's brief, implicitly conceding the point.

16

custody order that there was no evidence of domestic violence. Given these facts, we find no error in the family court's conclusion, as part of the April 2024 judgment, that domestic violence did "not appear to be applicable here."

*D. Amount of Spousal Support*

Christian contends the family court failed to provide a legal or factual basis for the $2,000 monthly spousal support order in favor of Yolanda. Other than the court's reference to Christian's parenting timeshare percentage—which we discuss further below—we find no error.

Under section 4330, subdivision (a), "the court may order a party to pay for the support of the other party an amount, for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances as provided in Chapter 2 (commencing with [s]ection 4320)."

The family court's detailed judgment leaves no doubt that, in arriving at the $2,000 monthly spousal support figure and finding imputation of income to Yolanda would not benefit or serve the interests of the minor children, the court considered all the factors articulated in section 4320 that it found relevant to the parties' circumstances. (See *Cheriton*, *supra*, 92 Cal.App.4th at p. 302 ["In ordering spousal support, the trial court *must* consider and weigh all of the circumstances enumerated in the statute, to the extent they are relevant to the case before it"].) Over the course of its three-page spousal support analysis, the court addressed Yolanda's marketable skills (§ 4320, subd. (a)(1)); the extent to which Yolanda's present or future earning capacity is impaired by periods of unemployment due to domestic duties (*id.,* subd. (a)(2)); the extent to which Yolanda contributed to Christian's education, training, or licensure (*id.*, subd. (b)); Christian's ability to pay spousal support, considering his earning capacity and all of his sources

17

of income, assets, and standard of living (*id.*, subd. (c)); the parties' marital standard of living (*id.*, subd. (a)); the goal that Yolanda be self-supporting within a reasonable time (*id.*, subd. (l)); the immediate and specific tax consequences to each party (*id.*, subd. (j)); the balance of hardships to each party (*id.*, sub. (k)); Yolanda's ability to engage in gainful employment without interfering with the interests of the minor children (*id.*, subd. (g)); and the parties' age and health (*id.*, subd. (h)).[13]

Christian complains the court did not "adequately" address some of these statutory factors—specifically, section 4320, subdivision (a) (the extent to which the earning capacity of each party is sufficient to maintain the marital standard of living); subdivision (c) (the ability of the supporting party to pay spousal support); subdivision (d) (the needs of each party based on the marital standard of living); and subdivision (i) (related to domestic violence). But Christian does not explain why the court's consideration of these factors was not "adequate" or what more, in his view, the court should have done to "adequately" consider them.

Our review of the family court's judgment, including its 17-page explanation of its rulings on the reserved issues, persuades us the court adequately evaluated the relevant factors. Having found the parties had a lower-middle-class marital standard of living, with an average income of $145,000 per year, the court noted Christian's monthly income of $15,833 per month far exceeded Yolanda's $17 per hour earnings (approximately $1,500

---

[13] The court explicitly found section 4320, subdivision (m) (related to criminal convictions of an abusive spouse) was not applicable on the facts; we find no fault in that conclusion. It also found domestic violence between the parties (section 4320, subd. (i)) "does not appear to be applicable here"—a conclusion we also do not find erroneous, as explained above.

per month). And it noted Yolanda's monthly rent alone was $3,700. This, coupled with the fact Yolanda had primary timeshare with the three children, necessitated a support award, in the family court's estimation. The court also made a specific finding that Christian's testimony regarding the scope of his income and assets was not credible.[14]

We find no basis to reverse the court's finding that spousal support of $2,000 per month is just and reasonable under the circumstances. The court clearly considered the factors Christian now contends it did not adequately address. It appears Christian simply disagrees with how the court weighed the relevant factors, the credibility determinations it made, and the conclusions it drew from the evidence, but the "'trial court has broad discretion in balancing the applicable statutory factors and determining the appropriate weight to accord to each . . . .'" (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442–1443.)

## III.

### CHILD SUPPORT ISSUES

*A. Calculation of Parenting Timeshare for Purposes of Child Support*

The family court ordered Christian to pay $3,461 in child support per month based on the court's "independent calculation" that Christian's overall timeshare with all three of the children was 18.67 percent. This was based on the fact Christian was spending no time with his oldest child (a zero percent timeshare for that child) and on the court's factual finding he had a 28 percent timeshare with each of the younger two children. Averaging the 28

---

[14] We are, of course, precluded from second-guessing the family court's credibility determinations. (See *In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 952.)

percent timeshares for the two younger children with the zero percent timeshare for the oldest child, the court arrived at an overall timeshare of 18.67 percent.

Christian asserts this was error because his share of time with the younger two children was 47 percent, and his overall timeshare with all three children was therefore 31.33 percent. We conclude neither the court's 18.67 percent timeshare number nor Christian's 31.33 percent timeshare number is supported by the evidence in the record before us.

The timeshare calculation was part of the mathematical formula for calculating guideline child support under section 4055. The formula includes a few variables, including the "approximate percentage of time that the high earner has or will have primary physical responsibility for the children compared to the other parent." (§ 4055, subd. (b)(1)(D).) We agree there is no substantial evidence to support the family court's 18.67 percent timeshare calculation because we find no evidentiary support for the starting point of that calculation—i.e., that Christian had a 28 percent timeshare with just the two younger children.

Although the judgment did not show or explain the arithmetic calculation that led the court to conclude Christian had a 28 percent timeshare for each of the two younger children, it appears to have been based on the understanding that the custody order gave Christian visitation with them for *four days* every two weeks. Having a child four days out of every 14 would indeed equal a timeshare of 28.57 percent. But the custody order gave Christian visitation of *five days* out of every 14 as an initial matter (three days on alternating weekends and one day every Wednesday), with the possibility of increasing to six days if he met the specified conditions. *Five days* out of every 14 would yield a 35.7 percent timeshare for each of the two

20

younger children. And when a 35.7 percent timeshare for the two younger children is averaged with the zero percent timeshare for the oldest child, that would yield a 23.8 percent overall timeshare for Christian for all three of his children—a significantly larger timeshare percentage than the court's 18.67 calculation.

Christian suggests we correct the timeshare number to reflect his proposed calculation of 47 percent. The problem with that argument is we also find no evidentiary support for Christian's assertion that he had a 47 percent timeshare calculation for the two younger children. Although not entirely clear, it appears Christian arrives at this figure in two steps. First, based on his assertion that since "at least April 2023" he has enjoyed the "stepped-up parenting time" permitted in the custody order, he argues he now has the two younger children for "[six] out of every 14 days of regular bi-weekly custodial parenting-time, or 43 [percent]." Second, he notes the 43 percent figure "does not include" the additional shared holiday and summer vacation parenting time the custody order granted with the two younger children. As a result, it appears he simply added another 4 percent to arrive at what he asserts is "the accurate parenting timeshare with [the two younger children of] 47 [percent]."

There are two flaws in Christian's argument. First, under the custody order, Christian was only entitled to the one additional day of mid-week visitation on alternate weeks (the "stepped-up" visitation) if he satisfied two specific conditions: (1) he had to meet at least twice with the reunification therapist, and (2) he had to register and complete a specific on-line parenting class, and then "file and serve [his] certificate[] of completion within 60 days from the date of [the] ruling." Christian does not point to any

evidence in the record that he satisfied both conditions.[15] Thus, as far as the record before us reflects, he was only entitled to have the two younger children for five out of every 14 days.

Christian insists there is no dispute he has been taking the two younger children for the sixth day. But even if that were the case, that brings us to the second flaw: Even if we assume (or assume the family court found or deemed it undisputed) that Christian had met the conditions for obtaining the sixth day of custody every fortnight and has consistently had custody of the two younger children for the additional day since April 2023, that still would yield only an approximately 43 percent timeshare for them (i.e., six is 42.8 percent of 14). There is no evidence to support the *47 percent* timeshare that Christian insists is "the accurate" timeshare for the two younger children and that, when averaged with the zero percent timeshare for the older child, would yield the 31.33 percent overall timeshare Christian has suggested. That leads us to conclude the record does not support either the court's starting point of a 28 percent timeshare for the two younger children or Christian's starting point of a 47 percent timeshare for them.

---

[15] Christian points to an excerpt from the transcript of his trial testimony in which he testified he had begun using the additional stepped-up time with the two youngest children "'several months ago'" and argues Yolanda does not dispute the accuracy of his testimony. He is correct that Yolanda's appellate brief does not dispute Christian has the children six days out of every 14. In fact, Yolanda's brief is oddly silent on the issue of the timeshare calculations; she makes no effort to show how the record would support the 28 percent timeshare for the two younger children that formed the first step in the family court's overall 18.67 percent calculation. Yolanda simply argues Christian failed to meet his burden to show the court's calculation was in error. As explained above, we disagree. The record demonstrates an evident error in the court's timeshare calculation.

We therefore reverse the family court's parenting timeshare calculation and remand to the court for further evaluation and determination of Christian's parenting timeshare for the three children. In addition, although we otherwise find no error in the court's child and spousal support orders, we reverse those orders for the sole reason that, in explaining the bases for both its child support and spousal support determinations, the court articulated, as one factor, the erroneous 18.67 percent overall timeshare calculation. We remand the matter to the family court to reevaluate its child and spousal support orders and, should it deem necessary, adjust them based on a corrected timeshare calculation.

## B. Imputing Income to Yolanda for Purposes of Child Support

To determine child support, the family court was required to consider the parties' income. (§ 4053, subd. (c).) As the family court's judgment noted, section 4058, subdivision (b)(1) permits a court, in its discretion, to consider the earning capacity of a parent in lieu of the parent's actual income, consistent with the best interest of the children and taking into consideration the overall welfare and developmental needs of the children and the time the parent spends with the children.

In *In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 19, another panel of this court held that, before imputing income to a parent, the court must make a finding that it is in the children's best interests to do so. It explained: "The reason is pretty obvious. Since the child support statutes expressly state the purpose of California's guideline child support system is to 'place the interests of children as the state's top priority,' (§ 4053, subd. (e)), it is counterintuitive—often counterproductive—to impute income to a custodial parent, because the objective effect of such an imputation will be to reduce the money otherwise available for the support of any minor children.

23

Accordingly, the court in *Cheriton* observed that no imputation of income should be made to a custodial parent unless it benefited the children." (*Id.* at pp. 18–19.)

As we explained in detail above, based on the record before us and the family court's detailed discussion of the parties' circumstances, we discern no error in the court's refusal to impute additional income to Yolanda. The judgment cited section 4058, subdivision (b)(2) and the nonexclusive factors set forth in it that may bear on the court's exercise of its discretion.[16] And the court stated it was required to "go through the factors"—and that it had done so.

For example, the court noted Yolanda had "relocated to the United States from Mexico due to her relationship with" Christian and, throughout the marriage, "took care of all domestic duties while [Christian] furthered his career." It considered Christian's employment as a licensed attorney, with a monthly salary of nearly $16,000 (almost $190,000 per year), and contrasted that with Yolanda's limited education, lack of any "real employment history," and current employment as a part-time nanny making $17 per hour. It noted "[t]he parties' youngest child was just over two years old when the parties separated, rendering [Yolanda] unable to work until that child became school age." It considered the fact that Christian "has an overall [timeshare] average of 18.67 percent given [his] 28 percent timeshare

---

[16] Those factors are: "evidence of the parent's assets, residence, employment and earnings history, job skills, educational attainment, literacy, age, health, criminal record and other employment barriers, and record of seeking work, as well as the local job market, the availability of employers willing to hire the parent, prevailing earnings levels in the local community, and other relevant background factors affecting the parent's ability to earn." (See § 4058, subd. (b)(2).)

24

with" the two younger children and "no current timeshare" with the older daughter. And it found particularly "significant" Christian's failure "to produce any evidence of [Yolanda's] vocational abilities and opportunity to work full time even at a minimum-wage job."

The court could (and, after a detailed analysis, did) reasonably conclude that imputing income to Yolanda, thereby reducing the amount of money available to support the children, was not warranted and would not be in the children's best interest. If, after reevaluating the parties' timeshare percentages on remand, the court concludes it is appropriate to revise its conclusion regarding imputation of income to Yolanda, it is free to do so.

IV.

DIVISION OF THE COMMUNITY ESTATE

The final arguments Christian makes are related. First, he contends the family court erred by ordering him, as part of the equalization payment, to reimburse the community for payments made on his law school student loans during the marriage. Second, he claims the court incorrectly used the Version One calculations in the Hopper Report to determine the amount of the equalization payment he owed to Yolanda, rather than the calculations in Version Two.

A. Student Loan Payments

Under section 2641, the community must be reimbursed for community funds used to repay loans incurred for education that "substantially enhances the earning capacity of" one of the spouses. (*Id.*, subd. (b)(1).) However, "[t]he reimbursement and assignment required by this section shall be reduced or modified to the extent circumstances render such a disposition unjust, including, but not limited to" a situation in which "[t]he community has substantially benefited from the education,

25

training, or loan incurred for the education or training of the party." (*Id.*, subd. (c)(1).) For purposes of determining whether the otherwise required reimbursement should be reduced or modified based on benefit to the community, subdivision (c)(1) creates "a rebuttable presumption, affecting the burden of proof, that the community *has not substantially benefited from community contributions to the education or training made less than 10 years before the commencement of the proceeding,* and that the community has substantially benefited from community contributions to the education or training made more than 10 years before the commencement of the proceeding." (Italics added.)

Because the community's payments on Christian's law school loans were made less than 10 years before the dissolution proceeding commenced, there is a rebuttable presumption the loan payments did *not* benefit the community. Consequently, to prevail on his argument that reimbursement should not be required, Christian was required to rebut the presumption the community received no benefit from the loan payments.

The family court, however, did not address whether the community benefited from the nearly 10 years of loan payments. Instead, it found "[i]t would be unjust to deny [Yolanda]'s request to reimburse her for the community payments made to [Christian]'s student loans" because of the wide disparity between the spouses' income and education and because Christian had consolidated his loans at a very low interest rate. The court found the stipulated amount of loan payments made during the marriage was

26

$24,791. Therefore, it found Yolanda was due an equalization payment of $12,395 for those contributions—i.e., half of $24,791.[17]

We find this was error. Although the trial court correctly recognized the rebuttable presumption of no benefit to the community (and, therefore, reimbursement to the community) created by section 2641, subdivision (c)(1), it failed to make a finding whether the evidence rebutted the presumption.

Had it done so, there could be only one result. The undisputed facts are more than sufficient to rebut the presumption that Christian's education (and the contributions the community made to it by paying more than $24,000 on his law school loans) did not substantially benefit the community. Which is to say, the record before us demonstrates clearly the community *did* substantially benefit from his education. Without Christian's education and subsequent employment as a lawyer at increasingly higher levels of compensation, the couple could not have obtained the standard of living they achieved, including the purchase of a home in Mission Viejo and luxury cars. When the couple sold their home, they received net proceeds of approximately $236,000, which the parties will divide equally. On this record,

---

[17] Christian argues the trial court incorrectly interpreted the Hopper Report to arrive at $24,791 as the stipulated amount. The Hopper Report, Version One, states $21,379 is the amount of student loan payments made using community property and this amount was "not incl[uded] in the" post-separation accounting. However, the report also lists an amount of $3,412 related to the student loan paid out of a Chase checking account and states this amount *was* "incl[uded] in" the post-separation accounting. This discrepancy is rendered irrelevant by our finding that the student loan payments should not be reimbursed at all, either as part of the court's adoption of the Version One analysis or as a stand-alone, additional item of reimbursement.

only a single conclusion is possible: the community funds used to repay the loans incurred for Christian's education substantially benefited the community by substantially enhancing both Christian's earning capacity and the marital standard of living. This is true even though the payments were made for slightly less than 10 years before the dissolution proceedings commenced. Christian was entitled to a determination whether he rebutted the presumption under section 2641, subdivision (c)(1). (See *In re Marriage of Weiner* (2003) 105 Cal.App.4th 235, 241.) And based on the evidence in the record, he clearly did.[18] We therefore reverse the trial court's ruling on this point: Christian is not required to reimburse the community for the student loan payments.

Yolanda argues *In re Marriage of Mullonkal & Kodiyamplakkil* (2020) 51 Cal.App.5th 604 (*Mullonkal*) supports the family court's ruling. We disagree.

---

[18] The family court cited two factors supporting its conclusion that reimbursement should be required: the low interest rate on the student loans and the disparity in the parties' income and education. Neither is pertinent to the determination required under section 2641, subdivision (c)— i.e., whether there are circumstances that would make it unjust to order Christian to reimburse the loan payments, such as a substantial benefit to the community from making the payments. The disparity in the parties' income and education is already considered as an important factor in the court's determination of the amounts of spousal and child support; it has nothing to do with whether Christian has shown the community received a substantial benefit from repaying the loans incurred for his education. Nor does the interest rate on the loans have any bearing on whether Christian rebutted the presumption of no benefit to the community because the payments were made for less than 10 years before the dissolution commenced. If anything, the community benefited by the fact that Christian was able to consolidate his loans at such a favorable low interest rate.

The facts in *Mullonkal* were unusual—and quite unlike those here. In that case, the trial court ordered a wife who had trained as a doctor to reimburse the community for student loan payments made during the marriage. (*Mullonkal, supra,* 51 Cal.App.5th at p. 619.) The marriage lasted only three years and five months. (*Id.* at p. 608.) When the couple married, the wife was completing her medical residency. When she finished residency, she began working at a hospital, which significantly increased her salary.

From their marriage in August 2011 to May 2013, the couple lived apart, and the husband was working and supporting himself separately in India. (*Mullonkal, supra,* 51 Cal.App.5th at p. 608.) In May 2013, the husband and wife began living together in California, where the wife began working for a new employer. From that point on, the husband did not work. They rented a small apartment and shared a car, even though the wife was earning approximately $200,000 per year. Aside from basic living expenses and the wife's student loan payments, the couple had no significant expenses. (*Id.* at pp. 608–609.) The wife was also repaying her parents for amounts they had loaned her for medical school. (*Id.* at p. 609.) She managed to fully repay both her medical school loans and the loans from her parents just before she filed for dissolution. (*Ibid.*)

Although the trial court concluded the community was not owed a reimbursement because the husband did not work after he came to the United States, the Court of Appeal disagreed. It observed the marital standard of living was low, and the couple lived together for only a short time before their divorce. Although the wife was earning a high salary, she put most of that money toward repaying her debts, rather than toward increasing the marital standard of living. Thus, her education had not substantially

29

benefited the community, and she was required to reimburse it for the amounts it paid to retire her student debt.

The situation before us is starkly different. The record shows the community benefited greatly from Christian's education. The couple cohabitated for nine years and had three children. For the entirety of the marriage, Yolanda did not need to work because Christian's education allowed him to support the family on a single salary. The marital standard of living was not low; when the parties separated, Christian was earning $150,000 per year (plus deferred compensation), and his average income throughout the marriage was $145,000 per year. After initially living in an apartment, the couple purchased a Mission Viejo home with Christian's earnings, which increased significantly in value and yielded significant gain upon its sale. During the marriage, they enjoyed nice cars, including a Mercedes-Benz and a Cadillac Escalade, and took nice vacations. The parties did not artificially depress the marital standard of living to funnel Christian's income into retiring his student loan debt. The facts here are readily distinguishable from those in *Mullonkal.*

B. *Equalization Payment*

Based on the Version One calculations set forth in the Hopper Report, the family court determined Yolanda was owed an overall equalization payment of $40,523, which included reimbursement for the student loan payments. We find this was error.

First and foremost, to the extent the court ordered Christian to pay an additional equalizing payment of $12,395 for the student loans, we reverse that aspect of the ruling as it appears to be duplicative of the student loan reimbursement that was already included in the $40,523 sum taken from Version One. And even if it were not duplicative, we reverse it because,

30

as shown above, it was error to require Christian to reimburse the community for the student loan payments.

Second, we find no merit in Christian's argument the family court was bound by a stipulation between the parties to accept the equalization payment set forth in Version Two of the Hopper Report, subject only to modification if it ultimately determined to require him to reimburse the community for the student loan payments.

Christian points to a document titled "Joint Statement of Issues to be Tried," which he filed with the family court on March 24, 2023. An attachment to that document lists items to which the parties purportedly stipulated and those that purportedly remained in dispute. One of the items listed as "stipulated," is "B. Hopper ver #2" with an equalization payment of $8,222 owed by Christian to Yolanda. It also lists as "disputed" $24,791 in student loan payments made by the community. Christian contends this document constitutes a written stipulation by both parties to use Version Two of the Hopper Report, to be adjusted only if (and as) necessary based on the family court's decision on the disputed issue of reimbursement of the student loan payments. But the copy of this purportedly "joint" document in the record before us was signed only by Christian's counsel, not by Yolanda's. Nothing indicates Yolanda stipulated to it.

Moreover, it is apparent the family court did not find it was bound by stipulation to use only Version Two, adjusted only (if necessary) to reflect its decision on the reimbursement of the student loans. First, by using Version One as the starting point for its equalization payment calculation, the family court at least implicitly rejected any assertion that the parties had stipulated to use Version Two for the calculation. Second, by ordering Yolanda to reimburse Christian for $5,362 he paid for the registration and

31

insurance on her Escalade—an amount that exceeded both the $292 registration-only amount in Version One and the $1,734 registration-plus-insurance amount in Version Two—the court implicitly found it was not bound to uncritically accept either Version One or Version Two.[19] In light of the record before us, we find no error in the court's implicit conclusion that it was free to calculate the equalization amount based on the evidence before it.

## DISPOSITION

The judgment ordering Christian to reimburse the community for the student loan payments it made during the marriage is reversed. The judgment is also reversed with respect to the portions of the judgment (including those contained in *Gavron* warning and elsewhere in the judgment) that prohibit Christian from seeking to modify spousal support and specify the types of training or degrees Yolanda must obtain for the family court to consider her self-supporting. The judgment is reversed with respect to the amount of Christian's overall timeshare with all three children. It is also reversed as to the child support and spousal support awards, but only insofar as they were based on or affected by the erroneous timeshare calculation. The matter is remanded with directions for the trial court to vacate these aspects of the judgment and to: (1) recalculate Christian's overall parenting timeshare with all three children, (2) determine whether any change in child support or spousal support is necessary based on its corrected overall parenting timeshare and to make any necessary changes to child or spousal support it deems appropriate, and (3) recalculate the

---

[19] The fact that the Hopper Report, when marked as an exhibit, was given the title "Barbara Hopper Report (Version #2)" is of no consequence.

equalization payment to Yolanda in a manner consistent with this opinion. In all other respects, the judgment is affirmed. Each party is to bear its own costs on appeal.

GOODING, J.

WE CONCUR:

MOORE, ACTING P.J.

SANCHEZ, J.